THIS OPINION
 HAS NO PRECEDENTIAL VALUE.  IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN
 ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.
THE STATE OF SOUTH CAROLINA
In The Court of Appeals

 
 
 
 Chet A. Wingate,
 Jr., Appellant,
 v.
 Executive Designs,
 Inc., Robin R. Leonard, Michael J. Gray, Charlotte W. Allen, and Mid-Atlantic
 Embroidery and Apparel, Inc., Respondents.
 
 
 

Appeal From York County
Paul M. Burch, Circuit Court Judge
Unpublished Opinion No.  2010-UP-219
Heard December 9, 2009  Filed March 29,
 2010
AFFIRMED

 
 
 
 William Thomas Moody, of York, for
 Appellant.
 Leland B. Greeley, of Rock Hill, for
 Respondents.
 
 
 

PER CURIAM:  In this
 shareholder dispute, Chet A. Wingate, Jr. appeals the trial court's denial of
 his motion for a new trial nisi additur or new trial absolute, arguing
 that the damages awarded to him by the jury were inadequate in light of the
 evidence presented at trial.  Wingate also appeals the trial court's decision
 to award four Carolina Panthers personal seat licenses to Executive Designs,
 Inc. (EDI), contending that the trial court erred by finding that Wingate used
 corporate assets to purchase the licenses.  We affirm.
FACTUAL/PROCEDURAL BACKGROUND
EDI
 was incorporated in South Carolina on March 8, 2001 for the purposes of
 engaging in the business of embroidering apparel.  The corporation, which was
 located in Clover, South Carolina, was formed by three shareholders: Wingate;
 Robin Leonard; and Michael Gray.  Wingate and Leonard each owned 45% of the
 shares of EDI's stock, while Gray owned 10%.  Wingate, who had previously
 worked at his father's business, Kenda Knits, doing embroidery work, served as
 President of EDI and was responsible for the day-to-day management of the corporation.[1] 
 Leonard and Gray, who were brothers-in-law, resided in Virginia, and they
 visited EDI's factory infrequently.  
A
 few days after EDI was incorporated, Wingate, Leonard and Gray entered into a
 Shareholder Management Agreement, in which they agreed that no debt would be
 incurred on behalf of the corporation absent a resolution of the shareholders. 
 Shortly thereafter, Wingate obtained, on EDI's behalf, a $25,000 line of credit
 from First Union, which later became Wachovia.  Wingate, who has a master's
 degree in business, personally guaranteed the line of credit despite the fact
 that he was a minority shareholder of EDI.  Although no shareholder resolution
 authorizing the loan was officially adopted, Leonard testified that both his
 signature and Gray's signature were on the signature cards for the loan. 
 However, Leonard's testimony was contradicted in part by that of Gray, who
 testified that he was not aware of the Wachovia line of credit.  
Subsequently,
 Wingate obtained in EDI's name (and personally guaranteed) the following loans
 from Provident Community Bank (Provident): (i) in September 2001, a $50,000
 line of credit;[2] (ii) in July 2002, a $60,000 closed-end loan; and (iii) in June 2003, another
 $100,000 line of credit.  According to Leonard and Gray, they did not authorize
 any of these loans from Provident.  
Less
 than a week after finalizing the $100,000 line of credit from Provident, Wingate
 purchased, for an aggregate sum of $15,000, four Carolina Panthers personal
 seat licenses (PSLs) for his own personal use.  Wingate admitted at trial that
 he bought the PSLs using an EDI corporate check.  
While
 managing EDI, Wingate routinely used corporate credit cards to purchase
 merchandise from vendors.  According to Wingate, about ten to fifteen percent
 of EDI's vendors required that credit cards be used to purchase merchandise. 
 Wingate also testified that he used his personal credit card to make purchases
 on behalf of EDI.  
For
 approximately the first two years of EDI's existence, William Newton, a friend
 of Wingate's, acted as the corporation's accountant.  However, in early 2003,
 he was forced to leave his position due to illness.[3] 
 In the spring of that year, Charlotte Allen was hired by Leonard to prepare EDI's
 2002 tax return and to perform other accounting work for the corporation.  She
 began corresponding with Wingate and Wingate's secretary, Patricia Burgess, to
 obtain the financial data she needed to prepare the 2002 return.  The return
 was filed in September 2003.  
On October 1, 2003,
 Leonard and Gray traveled to Clover and met with Wingate over lunch.  During
 that meeting, they agreed to move all of EDI's corporate records to Virginia,
 where Allen resided.  Two days later, Leonard sent an email to Wingate thanking
 him for the visit and informing him that they would be back on October 14th to pick up certain items.  
On October 14,
 2003, Leonard and Gray traveled to South Carolina, arriving before lunch. 
 Based upon a conversation that they had with an EDI employee, they decided to
 go to the York County courthouse to ascertain whether any UCC filings had been
 filed against EDI.  According to Leonard and Gray, they discovered that two UCC
 filings from two different financial institutions had been filed on EDI's
 equipment.  They also discovered that a UCC filing had been filed against
 Classic Apparela company formerly owned by Wingate that had been dissolved in September
 2000with respect to the inventory located at EDI's factory.  
Believing that
 Wingate was engaged in bank fraud, Leonard and Gray decided to terminate
 Wingate.  That afternoon, they arrived at EDI's factory accompanied by two York
 County sheriff's deputies.  Leonard entered the factory and asked Wingate to
 help him with something that he had in his vehicle.  When Wingate walked
 outside, Leonard told Wingate that his services were no longer needed and that
 he was fired.  
On
 October 18, 2003, Leonard and Gray held a shareholder's meeting in which they
 voted to cancel Wingate's stock ownership.  Wingate was not notified of the
 meeting, but he was later informed that his shares had been voided.  Karen
 Pocta, a longtime customer of both Kenda Knits and EDI, testified that when she
 called and inquired about Wingate, she was told by Gray that Wingate was no
 longer employed with EDI because he had been embezzling funds. 
In
 December 2003, Wingate filed a complaint against EDI, Leonard, Gray and Allen,
 alleging ten causes of action, including breach of fiduciary duty and
 defamation per se.[4] 
 The complaint also alleged two wage claims, one against EDI and the other
 against Leonard and Gray.  EDI subsequently filed a counterclaim against
 Wingate, contending breach of fiduciary duty and conversion.  Leonard and Gray
 also filed counterclaims, arguing fraud, breach of fiduciary duty, and
 conversion.  
The
 trial was held the week of October 23, 2006.  At trial, Wingate presented
 evidence showing that Provident had obtained a judgment of $130,121.98 against
 him after EDI defaulted on the Provident loans.  He also testified that, since
 being ousted from EDI, he had been paying $482.05 each month for the Wachovia
 line of credit.  He further testified that he had paid off credit card charges
 that he had incurred on behalf of EDI.  Altogether, Wingate testified that he
 had paid approximately $30,000 in corporate debts since he had been terminated
 from EDIa figure that did not include the Provident judgment, which he was
 still contesting.  
Respondents,
 in turn, presented evidence showing that the debts incurred by Wingate were not
 properly authorized.  Leonard testified that there were no shareholder
 resolutions authorizing Wingate to incur indebtedness on behalf of the
 corporation.  He further testified that the only time he mentioned credit cards
 to Wingate was when he told Wingate that no credit cards were needed.  In
 addition, Gray testified that he never authorized the Provident loans or any of
 the credit card charges that Wingate claimed he had incurred on behalf of EDI.  
Additionally,
 Respondents presented evidence demonstrating that Wingate had opened a
 corporate Advanta credit card account in Leonard's name without Leonard's
 knowledge and that the balance on the card as of September 9, 2003 was nearly
 $16,000.  They also presented evidence that Wingate submitted falsified
 invoices to Provident in order to obtain short-term credit under EDI's accounts
 receivable factoring arrangement with Provident.[5] 
 Furthermore, Allen testified that, according to her records, Wingate had
 withdrawn "somewhere in excess of $200,000" from EDI.[6]  
Finally,
 Respondents introduced evidence showing that EDI had performed poorly during
 its first two and half years of existence.  Allen testified that, for the nine
 month period ending September 30, 2003, EDI suffered a net loss of
 $100,838.79.  Additionally, Leonard testified that there was no profit in 2002
 despite a million dollars in gross sales, and Gray testified that he never
 received any distribution of profits.  
The
 jury ultimately found for Wingate with regard to his claims against Leonard and
 Gray for breach of fiduciary duty and defamation per se, and he was awarded
 $1.00 in actual damages and no punitive damages for each of those two claims.[7] 
 As to Wingate's two wage claims, the jury found against Wingate.  The jury also
 found against Wingate with respect to all five of the counterclaims filed
 against him, and it awarded $1.00 in actual damages and no punitive damages for
 each of those counterclaims.  
Wingate
 thereafter filed a motion for a new trial nisi additur or, in the
 alternative, a new trial absolute, arguing that the damages awarded to him were
 inadequate.  Additionally, EDI, Leonard and Gray moved for an order judicially
 dissolving EDI, valuing the shares of EDI, and declaring the four Carolina
 Panthers PSLs possessed by Wingate to be the property of EDI.  On December 13,
 2006, the trial court issued an order denying Wingate's motion for a new trial nisi
 additur or new trial absolute.  Additionally, pursuant to sections
 33-14-300 and 33-14-310 of the South Carolina Code (2006), the trial court
 judicially dissolved EDI, valued the shares of EDI at zero, and awarded the
 four Carolina Panthers PSLs to EDI.  Wingate now appeals.  
LAW/ANALYSIS
I.  Denial of Motion for New
 Trial Absolute or New Trial Nisi Additur
The trial
 court's failure to grant Wingate's motion for a new trial absolute or new trial nisi additur did not constitute reversible error.  "The grant or
 denial of new trial motions rests within the discretion of the trial judge and
 his decision will not be disturbed on appeal unless his findings are wholly
 unsupported by the evidence or the conclusions reached are controlled by error
 of law."  Vinson v. Hartley, 324 S.C. 389, 405, 477 S.E.2d 715, 723
 (Ct. App. 1996). 
A
 jury's determination of damages must be accorded "substantial deference."  Chapman v. Upstate RV & Marine, 364 S.C. 82, 89, 610 S.E.2d 852, 856
 (Ct. App. 2005).  "[I]t is the duty of the court to sustain verdicts when
 a logical reason for reconciling them can be found."  Daves v. Cleary,
 355 S.C. 216, 231, 584 S.E.2d 423, 430 (Ct. App. 2003).  A new trial absolute
 should be granted "only if the amount is so grossly inadequate or
 excessive so as to shock the conscience of the court and clearly indicates the
 figure reached was the result of passion, caprice, prejudice, partiality,
 corruption or some other improper motives."  RRR, Inc. v. Toggas,
 378 S.C. 174, 182, 662 S.E.2d 438, 442  (Ct. App. 2008).  Similarly, a new trial nisi additur should not be granted absent "[c]ompelling
 reasons."  Vinson, 324 S.C. at 405, 477 S.E.2d at 723. 
A
 verdict that assesses liability against the defendant but does not award the
 plaintiff any damages is inconsistent and contrary to South Carolina
 law.  Stevens v. Allen, 342 S.C. 47, 53, 536 S.E.2d 663, 666 (2000).  However,
 a verdict that assesses liability against the defendant and awards the
 plaintiff nominal damages such as one dollar is not necessarily improper.  The
 South Carolina Supreme Court has upheld such jury awards.  See Harrison
 v. Bevilacqua, 354 S.C. 129, 140-41, 580 S.E.2d 109, 115 (2003) (upholding
 jury award of $1.00).  
Here, Wingate claims
 that the $2.00 in total damages that he was awarded with respect to his breach
 of fiduciary duty and defamation per se causes of action was inadequate and
 inconsistent given that he presented evidence showing that he had been damaged
 in the following amounts: (1) wages unpaid by EDI in the amount of $70,940.00;
 (2) Provident judgment in the amount of $135,000;[8] and (3) debts unpaid by Respondents that were paid by Wingate in the amount of $58,000.[9]
However,
 regarding the first amount, the jury specifically found against Wingate with
 respect to his wage claims.  Thus, the jury's failure to award Wingate any
 damages in connection with those claims was clearly not inconsistent.  As to the
 last two amounts, the jury may have concluded that any damages owed to Wingate
 as a result of Leonard and Gray's actions were essentially balanced out by the
 damages owed to Leonard, Gray and EDI as a result of Wingate's actions.  As
 noted above, the jury found for Leonard, Gray and EDI on all five of the
 counterclaims they collectively filed against Wingate, yet it only awarded them
 a total of $5.00.  Accordingly, we conclude that the trial court did not commit
 reversible error by failing to grant Wingate's motion for a new trial absolute
 or new trial nisi additur.
II.  Award of Four Carolina
 Panthers PSLs to EDI
Additionally, the trial court did not err by awarding
 the four Carolina Panthers PSLs to EDI.  It is undisputed that Wingate
 purchased the PSLs by using an EDI corporate check.  Although Wingate claims
 that the $15,000 that he used to purchase the PSLs was a return of capital
 contributions he had made to EDI, he has not pointed to any
 contemporaneously-prepared accounting record or other financial document that
 corroborates his claim.[10] 
 Moreover, the evidence presented by Respondents regarding the Advanta credit
 card and the falsified invoices put Wingate's overall credibility in doubt.  Accordingly,
 we conclude that the most reasonable inference to make from the evidence
 presented is that Wingate used corporate assets to purchase the PSLs.
AFFIRMED.
HUFF
 and GEATHERS, JJ., and GOOLSBY, A.J., concur.  

[1] Wingate and
 Leonard originally met when Kenda Knits performed embroidery work for Leonard's
 employer.  
[2] That line of
 credit was subsequently paid off in October 2002 and replaced with a new $48,649.80
 loan.  
[3] Newton later died
 on January 10, 2004.  
[4] Wingate's
 complaint was later amended to add Mid-Atlantic Embroidery & Apparel, Inc. (Mid-Atlantic)
 as a defendant and to allege two additional causes of action.  Mid-Atlantic was
 a corporation formed by Leonard, Gray and Allen in the spring of 2004.  
[5] Under the
 factoring arrangement, at the time EDI sent an invoice to a customer, it would
 also send a copy of the invoice to Provident.  Provident would then forward EDI
 87% of the invoice amount by noon the next day.  Once the customer paid the
 invoice (payments were sent to Provident), Provident would then forward EDI the
 remaining amount of the invoice, minus a small financing fee.   
[6]  Although
 Wingate testified that he made capital contributions to EDI that were in excess
 to the amounts he withdrew from the corporation, Allen testified that she was
 unable to find any documentation in EDI's corporate financial records that
 showed Wingate's contributions to EDI.  
[7] At the
 conclusion of Wingate's case in chief, the trial court dismissed the causes of
 action against Allen.  Wingate has not appealed that ruling.   
[8] The $135,000
 figure appears to include interest charges incurred on the $130,121.98
 Provident judgment.  The Provident judgment, which was issued on August 24,
 2004, required that "interest at the judgment rate" be paid until the
 $130,121.98 amount was paid in full.  
[9] It is unclear exactly
 how Wingate derived the $58,000 figure.  As noted above, at trial, Wingate
 testified that he had paid approximately $30,000 in corporate debts since he
 had been terminated.  
[10] Although
 Plaintiff's Exhibit 12, a spreadsheet that purportedly shows Wingate's capital
 contributions and withdrawals, identifies the $15,000 used to purchase the PSLs
 as a withdrawal of Wingate's contributions, it is undated and does not, on its
 face, appear to be an EDI corporate record.  Moreover, as noted above, Allen
 testified that she was unable to find anything in EDI's corporate financial
 records that documented Wingate's alleged contributions to EDI.